13-6645. Robert Goodall v. Cadillac Ambulance and Hospital Authority. All argument not to be received. 15 minutes per side, and this minute is funded alone. You may approach the podium and proceed with your argument. May it please the Court, I am Jamie Bennett. I represent the relator plaintiff, Robert Whipple, in this false claims act case. Your Honors, we are here today on an appeal from a grant of summary judgment by the district court. The court below granted summary judgment to the appellee on a jurisdictional issue, finding that Mr. Whipple's false claims act was barred by the public disclosure bar in the false claims act, and that Mr. Whipple failed to qualify as an original source of the allegations in his complaint. Despite the fact that Mr. Whipple observed the fraud while he was employed at Erlanger Hospital, the appellee in this case, in the course of his duties as an auditor, while reviewing patient and claims data and by interviewing employees with knowledge of the fraud, the district court determined that he didn't meet the requirements of an original source because he didn't have direct and independent knowledge of the actual submission of claims to the defendant. We have three issues, Your Honors, on appeal. One is the standard of review that was employed by the district court. The second is whether a public disclosure actually occurred under the law of this circuit, and whether Mr. Whipple, in fact, qualified as an original source because, although he didn't have direct and independent knowledge of the actual submission of the claims, he had direct and independent of other elements of the offense, including the fact that false records had been created in order to submit false claims to the government by virtue of activities such as attaching short observational stays to inpatient surgeries as a matter of routine and admitting patients inpatient where there is no proof of medical necessity. So to... Both of those issues, public source, I mean original source and public disclosure, unfortunately for all of us, you can sort of pick and choose your cases and either look better or worse, can't you? Well, I think that there's a clear line in the Sixth Circuit precedent illuminated by a recent Supreme Court case that gives us really substantial guidance. So I agree that outside the circuit, there's case law, especially on the district court level, that supports almost any position that you want to take. But what I'm going to try to do today is to provide the court with a roadmap that I think leads to the decision that the appellant is seeking here. And I want to start by talking about the standard of review that was employed by the district court because I feel that that standard led to many of the errors that the appellant is arguing today. The district court decided to treat the jurisdictional motion that was filed as a motion for summary judgment. If you look at the court's memorandum opinion at page 2, what the court says is the defendant previously moved to dismiss this action for lack of subject matter jurisdiction. The court determined that this issue should be decided on a motion for summary judgment. So we're clearly, from the district court's perspective, in the motion for summary judgment mode. We are using the inferences that apply there in a motion for summary judgment. All of the inferences that can be drawn in the non-moving party's favor are drawn. The motion for summary judgment obviously is filed by the defendant. And the district court is not permitted to grant the motion if there's a genuine dispute of material facts. What we think that the district court did instead, although the opinion below is not a model of clarity, it appears that what the district court did was in fact to weigh and resolve issues of disputed fact. And we think that alone is error. And this court's opinion in Wright v. U.S., which was a case arising under the Federal Tort Claims Act, where in fact many issues of jurisdiction are intertwined with the merits. In other words, in Wright specifically, the issue was did the rangers act with discretion about whether they cut down the offending trees, the trees that resulted in the injury. And in Wright, the court determined that because it was a discretionary function, in other words, the regulations didn't clearly state whether the trees should be cut down or not, that the court did not have jurisdiction because the court doesn't have jurisdiction in Federal Tort Claims Act cases over discretionary functions. So in Wright v. U.S., the court held that when a district court in its discretion converts a motion that ordinarily would be heard under 12B1, which is the subject matter jurisdiction, and allows discovery, the district court must employ the summary judgment standard. So we think that is the case that governs this court's decision. So it's your position that among other things the court resolved disputed facts? Yes, Your Honor. And what's the most critical one in your view that the court resolved? Well, I think there are several, but the most critical point for us is the question whether the claims that were submitted were submitted knowingly. And I think the court is aware that the scienter requirement in the False Claims Act doesn't require the relator of the U.S. to prove fraud, but only that the defendant acted knowingly in the submission of the claims. Mr. Whipple's testimony is that based on his discussions with employees in positions of power at Erlanger, based on his review of spreadsheets that showed claims that have been submitted to the government, and based on his review of medical records, he was able to determine that the claims for the short stays, I'm just using that as a shorthand for many of the claims that were submitted that were improper, had been submitted knowingly. In the government audit, the defendant took the position that those claims had been submitted as a matter of negligence or misunderstanding by their staff about complex rules of Medicare that CMS promulgated about when an observation stay could be tacked on to a short stay. Does he have additional evidence or a new way of looking at the old evidence? No, I think that this is a completely new fact that he brings to the table. If the defendant talking to the government says, these were mistakes, we didn't understand what the rules required, that's a far different statement of the case than if you have someone like Mr. Whipple coming in and saying, I talked to some of the people who were involved in submission, and they told me, yes, we do this as a matter of routine. Almost as a matter of routine, we admit patients inpatient. In fact, one of the conversations he had with one of the Erlanger personnel was to say, Dr. Ray, I think I have that name right, always admits his patients inpatient instead of for observational stays, even if it's not medically required. He even saw orders that showed that there had been admissions without doctor's orders at all, and that's a fundamental requirement. Okay, so you're saying that one of the things, some of the information that he submitted to the government in that sealed document was that employees there made admissions to him regarding the purposefulness of their conduct. Yes, and also I'm saying, Your Honor, that not only did he get information from conversations he had with other employees, but also that he was able to look at spreadsheets that showed claims that had been submitted and medical records themselves and determine that there was no state... Okay, well, I'm trying to... That's why I asked you, is it a new way of looking at evidence that the government already had, or is it new evidence? So the rest of your answer I would regard as a new way of looking at evidence the government already had. No, I'm sorry. I was unclear. This is new evidence that the government didn't have. In the defendant's presentations to the Office of the Inspector General, they acknowledged that some improper claims had been submitted for observational stays and short stays, but they characterized those as mistakes or errors based on employees who didn't fully understand the regulations. Mr. Wickle comes at it from a completely different point of view, saying those were not errors. Those were not mistakes. It wasn't based on them not understanding. They had a deliberate policy that either encouraged or perhaps mandated, for example, the addition of an observational stay to a short stay surgery where it wasn't medically necessary. I can see from... Okay. I understand that's his allegation. Now I'm asking you, did he support that with evidence that the government did not already have? I think that the evidence that the government did not already have was the fact that Mr. Wickle had observed himself and had conversations with people in positions of authority at Erlanger where he raised his concerns about the fact that there seemed to be a deliberate pattern of submitting the types of claims that he thought were not justified under CMS regulations. And if you look at the brief, the appellee more or less concedes that, saying that when they met with members of the Office of the Inspector General, with Lee Penninger, their monitor under their previous CIA, they didn't bring to her attention the fact that they had received these complaints from Mr. Wickle that would have cast some doubt on whether these were really mistakes or not. Okay. My understanding is that Wickle was doing a review of submissions that already occurred. Exactly. Okay, so it wasn't a matter of continuing the practice after. No, his testimony was that these things were still going on. He was looking at data in spreadsheets for claims that had been submitted in the past and medical records, but he was also observing this as an ongoing phenomenon while he was there at Erlanger. I think, though, Your Honor, to really complete my answer to that, I'd have to say that it really doesn't matter. The fact that he looked at spreadsheets for claims that had been submitted in the past is not legally relevant under the False Claims Act. We often see situations where people leave their employment. Yes, I understand, but I still don't feel that I have an answer to my question. Did he, in the information that he provided to the government, were there facts that were additional to the facts that the government had? And when I say facts, I don't mean allegations. I mean, did that information include an account of conversations that he had that you just referred to where employees said, oh, yes, that's the way we're supposed to do it. When he submitted the information underlying his allegations in his complaint to the government, yes, he included that information, that he had had conversations with people who were in responsible positions in terms of compliance, that they had admitted to him that these practices occurred as a matter of routine. When he filed his complaint, yes, he brought that to the government's attention. Absolutely, it's set forth in the complaint itself, Your Honor. So getting back to my discussion of the standard of review, we think that that's one of the issues where the district court implicitly made a resolution of disputed facts. The critical element in a False Claims Act case is whether the claims have been submitted knowingly. And Mr. Whipple's evidence is that they were submitted knowingly. And as I said, the court implicitly made a factual decision on that by saying, well, the government certainly could have found out about whether these claims were submitted knowingly, whether they did or not didn't seem to be relevant. Does it matter if the government already completed, if the government knows about something, conducts an investigation, settles the matter, which includes a release for that period of time, can somebody come in and say, well, I have more information? Yes, Your Honor. In fact, there is a case right on point either in the Sixth Circuit or in Tennessee. I can't bring the name to the tip of my tongue. But what happened here was that there was an administrative investigation. And so that means that the Department of Health and Human Services was investigating the case. And they investigated it on an administrative basis where there were no False Claims Act penalties or damages. In an administrative proceeding, there is no release of False Claims Act liability. That's the law. The False Claims Act is within the jurisdiction of the Department of Justice. They have sole litigating authority. And unless the case is investigated and resolved by the Department of Justice, there is never a release that would release False Claims Act liability. The fact that the government had already investigated the case and may have reached an administrative resolution of it might affect damages in terms of whether the defendant gets an offset for that. But the Department of Justice is the only body that can release False Claims Act. And they protect that very jealously. As I can tell you, I was an AUSA for 20 years. And we made sure that we were in charge of those cases. It's in the statute, Your Honor. You're fresh out of time. Your red light is on. Oh, no, I didn't. Thank you, Your Honor. Thank you. Thank you. Good morning, Your Honors. May it please the Court. Jeffrey Buchholz for Appalachia Erlanger Health System. I'd like to start, Judge White, with your question about whether Mr. Whipple added evidence that the government didn't have already. And the answer is no. The question here, there are a number of questions that I'll try to get to, but I wanted to start with that because I think it's important. And it also goes to Judge Guy's question about the idea that the case law and public disclosure and original source is all over the place. It's not. There isn't a single case that lets a relator do anything like what Mr. Whipple was trying to do here. This is a matter where you don't have to guess at whether the public disclosure was adequate to alert the government to the information or whether the government was diligent enough to follow up on it or whether the government might have been trying to sit on it for some reason, as some cases have suggested is one purpose of allowing relators. This is a case where the government not only knew about the information in the sense of having it in its files, which some courts have said is not enough. This is the case where the government actively investigated. To the extent that the U.S. Attorney's Office in eastern Tennessee declined criminally and civilly, the Office of Inspector General, through two different offices within, the Office of Investigations and the Office of Counsel to the IG, both declined and referred it to AdvanceMed for administrative resolution. AdvanceMed and Erlanger then resolved it, and AdvanceMed, in its resolution, agreed that the matter was resolved. And they said, this is at page 2,117. But why isn't this exactly the kind of case that it's meant to? I mean, there was some information. Your client gave an explanation. The government felt it was acceptable. They didn't have more information. And they made an administrative settlement. But then Whipple comes along and says, well, that's all well and good, but now I have some admissions that you didn't have. And this is not a mistake, as they claimed. This was a concerted, intentional effort to bill at a much higher level. First of all, Judge White, Mr. Whipple does not have direct knowledge of the fraud that he alleges. And so maybe that's the most direct answer to your question. The example that my friend just gave of direct knowledge, which is what the original source requirement requires, was she referred to Dr. Ray. She misspoke. It's Dr. Jones who Mr. Whipple refers to. But I'd like to make sure that your honors understand exactly what Mr. Whipple said in his deposition about this supposed example showing his direct knowledge of fraud. Mr. Whipple in his deposition said at page 1837 of the record, I don't know whether Dr. Jones is a cardiologist or an internist. I don't know who his patients were, whoever they were. I heard through another doctor that Dr. Jones had directed his people, whoever they are, to admit everyone as an inpatient. That's direct knowledge. That's the example that my friend gave to show direct knowledge. And I think it's important to remember that this is a jurisdictional provision, and I'll turn to the standard of review if the court has questions about that. But the point is Mr. Whipple bears a burden here not just of allegations but of evidence. He has a burden to prove through competent proof direct knowledge of the fraud that he alleges. And that's his example. That's not direct knowledge. That's rank hearsay. He doesn't even know what kind of doctor that is, let alone who the patients were, let alone have a direct knowledge basis to say that the inpatient admission decisions that he's challenging in this case were made fraudulently. And did he say I heard or that a particular person told me? I don't think he identified the person who supposedly told him that Dr. Jones had that practice, but I don't think that that would matter. I think either way it wouldn't be direct knowledge of Dr. Jones' supposed practice. And I think it's also important here that the kind of fraud that Mr. Whipple is alleging is fraud with respect to physicians' decisions about how to admit patients. And as Mr. Whipple's own complaint makes clear, this is in paragraphs 83 to 85 of his complaint, that under the Medicare manual and the regulations that admission decisions are complex medical judgments that require the treating physician to take into account an entire array of factors. It's not just the condition the patient presents with, but it's also the patient's comorbidities. It's also the patient's medical history. And it's as much art as science. It's the physician's predictive judgment about the kind of care the patient will need and how long that will take and what that will entail. And the Medicare manual recognizes that decision has to be made at the front end by the physician when the patient shows up. Well, I think you already lost that when you settled, right? I mean, you're not arguing that there was no improper billing. No, Your Honor. I think this is an important point because Mr. Whipple's allegation is that it was fraud, not just that under the criteria that the patient should have been this rather than that. Mr. Whipple's allegations are that those doctors who signed orders designating certain patients as inpatients were committing fraud as opposed to made a medical judgment that is debatable or even that after the fact, you know, maybe you would say turned out to be the wrong medical judgment. His allegation is that was fraudulent. Well, you're not saying that the government would need admissible evidence to prove that. I mean, if the government had this information, right, the government could trace who said it and go back to Dr. Jones and ask him what his practices are and trace that back to, I mean, the government would use it as an investigative tool to come to a different conclusion. Perhaps the government could, but the point here is the original source statute requires Mr. Whipple to have direct knowledge of the information supporting his allegations, and to satisfy the jurisdictional requirement, he has to not just allege direct knowledge, he has to show through competent proof after, and the Tenth Circuit is the case that we cite in our brief for this, and there are others that make clear this is a competent proof situation. This isn't about alleging direct knowledge. This is about showing what knowledge you have, where you got it, what it is, and why it's direct. And the reason I was trying to emphasize that the fraud here that's alleged relates to doctors' admissions decisions is you can't just look at a spreadsheet that says patient X was admitted on this date and was discharged on this date, and the diagnosis code is the following, and say the admission decision was fraudulent, because the Medicare manual itself recognizes that sometimes doctors will make an admission decision that somebody is an inpatient, which suggests the doctor thinks the patient's going to need to stay for a long time, and then the patient will not turn out to need to stay as long, and the mere fact that the doctor's admission prediction turns out not to be right doesn't mean that there's fraud. So Mr. Whipple relies on these spreadsheets that he examined, but all they have in them is the admission date and the discharge date and the diagnosis code and the amount paid. And Mr. Whipple says in his deposition that he's such an expert about this that he doesn't even need to look at the medical records. If there's a diagnosis code and a discharge the same day or the day after, then the inpatient admission decision must have been fraudulent. I submit, Your Honors, that's not direct knowledge of fraudulent admissions decisions by those doctors. Mr. Whipple never talked to those doctors. He wasn't involved in those admission decisions. Well, to be fair, he's saying that the records show a pattern of these alleged abuses and that instance after instance that there's so many disparities between what should have been charged and what was that the fraud is apparent from the records themselves. I think that's what he's saying, isn't it? Judge Clay, if that's what he's saying, then I think that just shows why his knowledge of the fraud that he alleges is not direct and is not supported through competent proof. Because the nature of this is that whether he wants to admit it or not, he's challenging physician admissions decisions. And he's saying those physicians, when they said this patient should be an inpatient, were committing fraud. And what my friend said a moment ago is that the district court said the problem was  That's a red herring, Your Honors. Erlinger's a hospital. Erlinger submits claims. I'm not going to dispute that. The issue isn't direct. He's saying that he has knowledge of what the data shows, not that he has knowledge of each individual patient's condition from having examined each and every patient. But, Your Honor, he doesn't have knowledge of what the data shows in a sense that would provide competent proof or direct knowledge of fraud in the admission decisions. All he has is spreadsheets that show the discharge date and the admission date, and he infers that if the discharge date wasn't long enough after the admission date, then that must mean that it was fraudulent. But that's contrary to Medicare manual itself. But doesn't he have a basis for comparison against some standard in the industry in terms of admissions for certain ailments and things like that? I mean, he's not just – There are presumptive standards in the industry, Your Honor, for certain diagnoses. That may be true, but that doesn't mean that it's fraud. The point is that if a doctor decides that there's a patient who presents and who may have a diagnosis and maybe the standard in the manual or in the guidance from the carrier is that that usually is an outpatient diagnosis, not an inpatient diagnosis, the doctor still has to make that decision. Pages 3060 and 3065 of the record is the Medicare manual on a local coverage determination. I can explain this in detail. The doctor makes that decision not based on what the diagnosis code is. This isn't a rigid thing where there's a code and that corresponds to an admission decision, and that's that. The doctor is supposed to take into account the entire array of factors relevant to that individual patient. Did the government have these records? The government had the records of – yes. First of all, the government had all the records that it wanted to have access to. The government asked for certain records in certain time periods of certain patients, and those were provided. The government could have asked for whatever records it wanted. The broader point here is the government conducted an active investigation. There's no doubt about that. There's no doubt that it involved OIG as well as the U.S. Attorney's Office having the opportunity to get involved civilly under the False Claims Act or criminally in declining, and the government directing AdvanceMed to resolve it administratively. I guess stepping back a little bit from the details of the investigation, there isn't a single case that says that what Congress intended in the QTAM provisions was after the government not only has had notice of allegations of fraud and had the ability to do something about it but has actually investigated those allegations and has reached whatever resolution the government in the exercise of the prosecutorial discretion that our Constitution gives it that it thinks is appropriate, that then a year later a private citizen like Mr. Whipple can come in and say, well, I don't think the government got it right. Well, let's say he had smoking gun evidence. You're saying he couldn't come in with it then? If he were an original source, Your Honor, then I guess under the statute he could. Okay, so don't make the argument that you can't come in after the fact. But, Your Honor, the point is, Judge Guy asked earlier about the case law being unclear or being in disarray. I don't think that's right. I think the only cases that are at all on point here where a relator tries to reopen, essentially, a matter the government has resolved in the way the government saw fit because the relator has a different view of things, are Reagan from the Fifth Circuit and Glazer from the Seventh Circuit. The district court relied on Reagan. Reagan's a case where there was a similar investigation by HICFA, CMS's predecessor, of alleged Medicare billing fraud and the carrier, Blue Cross. They did an investigation that resulted in the defendant repaying some amount of money. The relator apparently thought that that wasn't good enough and that the government hadn't looked deep enough or whatever, and the relator tried to reopen that through a QTAM. The Fifth Circuit said that's not direct knowledge of new information, that's just a different view about the information the government already looked into. Let me ask you this question. This summary judgment that was granted was essentially a summary judgment and it started as one thing and was converted, but it's essentially a summary judgment on a jurisdictional issue. Yes, Your Honor. Now, in that posture, in order to defeat the motion, does the person against whom the motion is brought have to demonstrate that he could win the case on the merits? No, Your Honor. It seems to me that a lot of this discussion goes to, for example, on the issue of intent. At the jurisdictional stage, does he have to show that he could prove that they intended to do this, that it was intentional? No, Your Honor. Let me try to address the standard review and try to clear this up. The district court referred to summary judgment. The district court said initially, we initially moved under 12b.1 to dismiss. The district court said there needs to be discovery about the public disclosure issues.  There was discovery. It makes sense that there needed to be discovery. The district court then said, I think the district court just sort of loosely referred to summary judgment as the thing that happens after the pleading stage, after there's been discovery, and said renew your motion after discovery as one for summary judgment. The district court said, as my friend has pointed out, that the merits and the public disclosure issues were intertwined, but that's just not correct. The district court also said, and this is more to the point, the district court spoke the language of rule 12b.1 in saying, I'm allowed to resolve disputed facts. I'm allowed to go outside the pleadings. I'm allowed to consider all the evidence. I'm allowed to make credibility determinations, et cetera. That's all true under rule 12b.1, as this court's Ohio National Life and other decisions make clear, and it's just not true that there's any intertwinement between the merits and the public disclosure issues. If a relator satisfies his burden to prove that he's an original source or that there hasn't been a public disclosure, that gets him to start. That doesn't win the case. That's not proving anything on the merits. That's just establishing that the court has jurisdiction to consider the merits. And as the Fourth Circuit's Vuuru decision and the Third Circuit's Atkinson decision that we cite in our briefs make very clear, there are a number of courts that have said, without really examining the issue, that the merits and public disclosure are intertwined, but they're really just not, and that's just loose language in some decisions that shouldn't distract from what's really at issue here. What's really at issue here is, under the public disclosure bar, Mr. Whipple had the burden to prove through competent proof what the public disclosure bar in the original source provision requires, which is direct knowledge of the fraud that he alleges, of what he alleges in his complaint. He alleges fraud with respect to complex medical judgments that he didn't participate in, that he didn't observe, and that he doesn't have any direct knowledge to support his claims that they were fraudulent. For that reason, the district court was correct. Although it cited summary judgment loosely, it was correct in what it found, and this court should affirm the decision that there was no jurisdiction. Well, was the judge required to look at the allegations in the light most favorable to Whipple, or not? No. No, Your Honor, because this was a 12-v-1 factual attack on jurisdiction. That's why the court ordered discovery, because we were past just the allegations. And so the district court was required to, and did, consider all the evidence developed during discovery, and hold Mr. Whipple to his evidentiary burden of proof to show jurisdiction that Mr. Whipple had the burden to prove. I understand, but I'm asking you, does the judge look at the facts presented by Whipple in the light most favorable to Whipple? No, Your Honor, the judge did not have to do that. That would be the summary judgment framework. Okay, so the judge can decide the facts. The judge can resolve genuinely disputed facts under Rule 12-v-1 in a factual attack so long as the jurisdictional issues are not intertwined with the merits. If they are, then this court hasn't ever said that in a published opinion. Other courts have said that that means that the jurisdictional issues should be assumed and deferred to the merits. What facts did the judge decide? Your Honor, I'm not really even sure the judge made any findings of genuinely disputed facts, which is why this standard review is a red herring on top of a red herring. The judge had to decide whether Mr. Whipple's evidence that he produced showed direct knowledge. Direct knowledge is largely a legal question. What qualifies as direct? To the extent it's a mixed question of law and fact, I don't think there really is any dispute here. Mr. Whipple wasn't at Erlanger when the conduct that he says was fraudulent occurred. He can't have firsthand knowledge of those admission decisions. He wasn't involved in them. He didn't see them. He didn't participate in them. And he doesn't even have firsthand knowledge of the decisions to submit the claims for reimbursement for those earlier admissions decisions because all of the claims that he talks about in his complaint have been submitted before he got there. I just have one last question. Okay. If Whipple contended that while he was there, he saw this, and he went over to the hospital, his superior in the hospital, somebody who's in charge of billing, and he said, well, this is really bizarre. Like, what's going on? And the person had said, oh, that's the way we do it. That way we get more money. Would that count as firsthand information? I think it would depend on what the this is, Your Honor. I'm sorry. I don't mean to not respond directly to the question, but the allegation here is. Okay. He says, look, it looks like we're admitting all of these people, but then, like, they leave the very next day. But we're calling them impatient. You know, like, this is just really strange. And the head of billing says, oh, no, we do that on purpose, because that way we get more money. We get higher reimbursement rates. So we admit the people, and then we let them go the next day. First of all, Your Honor, I understand it's a hypo, but I want to make clear that it's a hypo, because there is no evidence like that here. But second, I think the answer still is that isn't direct knowledge that the physician's admissions decisions were fraudulent. I mean, it would depend on the nature of the fraud. If the fraud that were alleged here was cut and dry, we're like in the Arnold case that Whipple relies on, where the issue is whether consultants had a certain credential or not. You look at the consultant's files, show they didn't have the credential in question. You know the bill said they did. It's cut and dried. Admissions decisions for inpatients are just not like that. They're complex medical judgments. And unless Mr. Whipple had direct knowledge that those complex medical judgments were being made fraudulently, he wouldn't have direct knowledge of the fraud that he alleges here. And, again, his complaint alleges that all of the- You've answered my question as far as I'm concerned. Thank you. Thank you, Your Honor. I appreciate that. Thank you. We'll have rebuttal. Did you reserve any rebuttal time? I did not. Oh, you did not. Okay. Well, in that case, the case is submitted.